Good morning, Your Honors. May it please the Court. I'm Christopher Sproul for the Plaintiff-Appellant Friends of the River. Upon proper application of this Court's precedent upon precedent in the Cottonwood, Washington Toxics, and Pacific Rivers case, respectfully, the District Court should be reversed, and this Court should remand with instructions for further proceedings along the lines of suggested in our briefing. At the heart of this case is whether there is an ongoing agency action that merits, that warrants the procedural right to the plaintiff-appellant of a renewed consultation under ESA Section 7. There is an obligation for Section 7 consultation raised by this case because, as Cottonwood, Washington Toxics, and Pacific Rivers all instruct, there is a past action, but there is retained ongoing federal relationship with and interaction with that past action. The cases that the federal government and federal defendants and Yuba County Water Agency rely on are not instructive here. Those cases, Sierra Club v. Babbitt, Cal Sport Fishing, Environmental Protection Information Center, all involve the distinguishable circumstance of the government issuance of third-party licenses and then the lack of federal ongoing involvement with those third-party licenses. That's not the case here. The action, properly framed, is the construction of Daguerre and Englebright dams, plus the issuances of these licenses to various infrastructure that are intimately interrelated with Englebright Dam. I thought it was the construction. I mean, the construction is done, but the operation, I thought, is what you're focused on. Well, yes, Your Honor, absolutely. That is also an action. I mean, the action is properly framed as twofold. It's, one, the construction of these dams. The Corps of Engineers, in their B.A., explained that, in their consideration, the continued operation of the dams and the Suppose we find that that explanation is sufficient under the Act. Is it your position that we should remand because the agency has not explained why it changed its mind? Yes, very much, Your Honor.  The agency would go back and the agency would say, you know what, we should have included a paragraph, this and this and this, from the Corps of Engineers report from the B.A., and we agree 100 percent, and that's our reason. Would that be enough? No, Your Honor, and here's why. Because it's implicit in the record that the National Marine Fisheries Service, or Fisheries Service for short, flip-flopped after four times over 10 years. No question about it. Yes, but the reason that they flip-flopped is not clearly explained. So let me put the case to you that I agree with you they flip-flopped. I agree with you that the bio-op of the service was insufficient to explain the flip-flop. If we remand it and say, explain your flip-flop, and they say, we agree with the Corps of Engineers that this is no longer an agency action, it is environmental background, wouldn't that be sufficient? No, Your Honor. Why? Here's why. Because in their flip-flop, while not clearly explained, the record at least strongly implies that the reason they changed course is they found that they had, unlike what they had found before in the 2012 bio-op and previous biological opinions before that, that they had to accept the Army Corps' definition or description or analysis, if you will, of the extent of the Army Corps' discretion. Right. But that's plainly wrong. And so what the Court should do here is not merely remand to the National Marine Fisheries or Fisheries Service for an explanation why they flip-flopped, why after 10 years of consistently finding one way they found a new way in the 2014 biological opinion, but to address this particular point. Why did you flip-flop? Did you flip-flop because you thought you, unlike what you had found before, had no authority or ability to second-guess the Army Corps' analysis of the extent of its discretion? Because clearly, National Marine Fisheries or Fisheries Service does have discretion, does have authority to independently analyze this question. Why is that true? One, they did it over and over again, and two, this Court has found as much. In Sierra Club v. Babbitt — But if the Fisheries Service were to say, we agree with the Corps of Engineers that their discretion is simply as a recreational uses of the lakes before the dams, wouldn't that be sufficient? Well, I think it would be plainly erroneous, but still the — Why would it be plainly erroneous? Because the law couldn't be clearer that the Army Corps does have discretion over these dams and does have discretionary authority. They found that in their own biological assessments more than once, and then the National Marine Fisheries Service also found that. They can't change their minds? They can change their minds, but they can only change their minds if their new view is actually legally defensible, which it clearly is not, because it would contradict this Court's findings in Cottonwood, Washington Toxics, and Pacific Rivers that — in other cases, San Luis Mendoza Delta is another — that what matters is does an agency retain any discretion? It doesn't have to have a lot of discretion. And the Army Corps federal defendants misframe the argument here when they say, we lack discretion to remove these dams or, quote, unquote, to substantially modify them. Implicit in that is a concession that they have at least some discretion to modify, maybe modify the dams. Maybe they can't, and I think this is wrong, and I'll get to that. But just taking their arguments on their face, they say we cannot, quote, unquote, substantially modify. Well, this Court's precedent makes it plain that as long as they can take any action, any discretion, if they have any discretion to take actions to benefit the listed endangered species, that triggers a duty to consult. So can I ask you how this works in practice in your view? So if they're operating the dam in an ongoing way, then it would seem like every day they have discretion. So do they have to consult every day? I mean, how does the timeline work on your view of this consultation obligation? Well, certainly they wouldn't have to consult over and over again, but they have to consult at least once. Having — I mean, well, okay, so once and then they never have to again? I wouldn't have thought that was your view because it seems like you think they're always using discretion. Well, it's not, Your Honor, that they can consult once and that's forever the end of it. It might be, but it's not necessarily true. I mean, the law is plain, and this Court has spoken to it about when is there a duty to reinitiate consultation. Cottonwood talks about that, for example. So they don't have to reinitiate consultation on their ongoing operation and maintenance of Daguerre and Englebright dams if they have consulted once and there's no new circumstance triggering the duty to consult. And there is a National Marine Fisheries Service regulation that sets forth what are the factors that trigger the duty to consult. But so hypothetically, if a tribe or an environmental group comes to the government and says, we'll help pay to modify this dam, is that going to trigger a consultation? Because that didn't seem to be one of the factors, but it seems like maybe that's part of your argument, is like sometimes groups might have private funding to help remove a dam or change a dam. I mean, I think your idea about discretion depends on there being some actual ability to change something, right? It does, very much. Again, that's the case law, Cottonwood, Washington, Toxic Pacific Rivers. The federal agency does have to have some ability, some discretionary authority to act, but they plainly do. And a third party... So like an offer to help pay might be one thing, maybe new technology, like one of these fish tubes or something. I mean, like when someone develops one of these fish shooter tubes, does that trigger an obligation to consult now because there's a new thing to be discretionary about? Well, conceivably, but that isn't the facts, and that's not part of our argument, I would say. I mean, what our argument is, is that the original organic acts under which these dams were constructed, the 1893 Act and the 1935 Act, gave broad congressional mandates to build... It didn't say build the Gerrit Engelbreit. It said build something to restrain mining debris. And so this is the organic authority under which the Army Corps or its predecessor, the California Debris Commission, which consisted of the Army Corps of Engineers, built these dams. And there's nothing in those original acts that say you can modify or can't modify. It just says build these dams. So the... But again, applying Kurook tribe and these other cases that I've mentioned, when you have a broad congressional mandate that doesn't say exactly what you must do, if it generally leaves you discretion to act on behalf of the species, then generally under ESA Section 7, which imposes a substantive duty on federal agencies to act to benefit species, unless, as the Supreme Court has spoken in the Home Builders case, unless a congressional mandate obligates you to do X and only X, and you have no discretion to do otherwise. Like when EPA, under the Clean Water Act, as the facts were in Home Builders, were directed, if the state of Arizona submits an application that has the following elements in it, you must approve it. You have no discretion. You can't impose additional conditions to protect endangered species. Therefore, you have no discretion and therefore no duty to consult. But that's not what these 1893 and 1935 acts are like. They just say, generally, build something to restrain mining debris. They can... The Army Corps, and this is our argument, they have authority, one, under ESA Section 7, but under many other statutory provisions too, express authority to go in and modify Daguerrean-Engelbright dams, to physically modify Daguerrean-Engelbright dams. And that's like 33 U.S.C. 2330? The... Or 2309? Actually, Your Honor, it's 33 U.S.C. Section 685, 684, and I believe 661 are all the... is where the 1893 act was codified and where... But I was talking about, like, 33 U.S.C. 2330 talks about allowing the Corps to carry out a project to restore and protect an aquatic ecosystem, including removal of a dam. Exactly. Yes, Your Honor. That's the 1896 Water Resources Development Act, where it was codified, if I understand correctly, or get the citation correctly. But, yes, there are several statutes that give the Army Corps of Engineers express authority to at least make some physical modifications to the dam. But in addition to that, they also clearly have authority to make non-physical modifications to how they manage and operate these dams. And the Court need not take my word for it. Just look at the actual behavior, the actual record of the Army Corps of Engineers over the last 20 years. The Army Corps... And well before that. The Army Corps has repeatedly physically modified Daguerre dam and has changed the way it maintains and operates these dams in part in express response or express reaction to the National Marine Fisheries Service identifying reasonable and prudent alternative and reasonable and prudent measures that the Army Corps had to implement to avoid harm to the illicit fish. And the Corps actually implemented some of those measures without claiming, well, we can't do that, that we don't have the authority to do that. I mean, they plainly do have the authority to do things, and they actually, as we speak today, they are doing things to benefit the listed species. Just not all the things that we think they ought to do. And not only the things that we think they ought to do that they're not doing, that the National Marine Fisheries Service, the expert agency with authority, with the scientific knowledge about what the listed species require, that the Fisheries Service identified and required the Army Corps to implement to avoid jeopardizing the survival and recovery of three listed endangered fish. Thank you very much. You want to go? Yeah. I noticed, also, sorry, I didn't say this at the beginning, but I would like to reserve three minutes of my time for rebuttal. I see that I still have a couple more minutes before those three minutes are up. But, again, I just wanted to emphasize that the defendant's argument is predicated on that Daguerre and Englebright were built a long time ago, and that should be dispositive of this case. But that's plainly not. As the Court emphasized in Cottonwood, quote, an agency's responsibility to reinitiate consultation does not terminate when the underlying action is complete. There is nothing in the ESA or its implementing regulations that limits consultation duties to situations where there is, quote, ongoing agency action. As long as the action, even if it's passed conceitedly, the construction of Daguerre and Englebright Dam are past activities, but there is ongoing federal involvement in that past activity. They retain discretionary authority to change how Englebright and Daguerre are physically situated, which they have done, as I emphasized a moment ago. They built fish ladders on Daguerre. There was nothing in the original statute, the 1893 Act or the 1935 Act, that specified they were to build fish ladders. They did that on their own separate authority. Did anybody object? No. No one objected. Very often people do things, and if they don't object, they don't become, all of a sudden, the rule that should be there. They didn't get up to court. That's true, Your Honor, but there has been controversy over what the Army Corps can and can't do in recent years, and they certainly, adding fish ladders to Daguerre is only one of a laundry list of things that they've done. For example, they installed fish grates over the fish ladders to prevent the fish from jumping out to their death. This was ordered by District Court Judge Carlton.  well, we can't physically modify the dam. We don't have a congressional appropriation for that. We don't have to express a new act of Congress that allows us to modify the dam. They complied with the injunction, and they modified the dam. And that was a matter of controversy, and it was litigated, and it was ordered against their objections. The District Court Judge ordered them to do it, and they complied without raising this argument. But again, there are several other things that they've done. They've dredged the channels that lead from the fish ladders to the main channel of the river. They've added a log boom to try and keep logs from entering the fish ladders. That was a construction activity related to the dams. They added a fish counter. They physically attached a fish counter to Daguerre Dam, which was something that fishery service specified, that in order to minimize take of the species, we need you to put on a fish counter. In turn, they didn't say, well, we can't put on a fish counter. There's no congressional appropriation bill authorizing the fish counter. They just did it because they plainly have authority to do certain things. And again, under this Court's precedent, that authority to do things to benefit the fish, what they unmistakably have and have exercised, is enough to trigger a consultation duty. And I see that now I'm eating into my rebuttal time. Thank you very much, Mr. Sproul. Thank you, Your Honors. May it please the Court, Rachel Heron on behalf of the federal appellees. With the Court's permission, I'll plan to take about 14 minutes of the time and then turn the podium over to the intervener Yuba County Water Agency. This Court has explained that Section 7 of the ESA is a do-no-harm provision. What matters under Section 7 is an agency's affirmative actions and activities. Here, the Court's affirmative actions are the minimal custodial activities it undertakes at two relatively crude sediment-retaining dams. Friends of the River instead wants to make this case about everything that the Corps could possibly do but is not doing. So the cases that you rely on for this inaction versus action distinction seem to me to all be about where the inaction was the agency's regulatory authority. So it's the agency not imposing, like, a new pollution control on a power plant or the agency not requiring some private party that had some easement to do some extra thing. Here, it seems like the act that is alleged to be injuring the fish is the agency itself operating this dam, not some third party. So I don't know, do you have any case that's more applicable to this allegation than the ones you cited? So I think the most applicable case is National Wildlife Federation versus NIMPS. Because that one's about dams. That was involved in the operations of dams. But there you cite one sentence that says the dams are included in the baseline, but you don't cite the next sentence which talks about the agency's discretion in operating the dams under the ESA. So it goes on to say that the operation is discretion and is part of something that the ESA is concerned about. Yes, the operation of dams unquestionably is. And here, the operations that the Corps undertakes at the dams, the actual things that it does every day with regard to the dams, performing the inspections, maintaining the reservoir area, actually operating the fish ladders at Daguerre Point, all of that is what the Corps consulted on here with NIMPS. Right, but they're saying there were other things you could do, whatever they are, putting one of these fish shooter tubes or putting the ladder on the other dam or a lot of the things you might have done, and you didn't consult about them. And then you're saying, well, that's inaction, but then you're citing these regulatory cases. So I don't understand where this authority is coming from, especially given that you used to consult about it, to all of a sudden say this is inaction that doesn't count. So if I could put aside the question of the past, the change in position just for now to get to the meat of this question. I think that the decision in California sport fishing, which understandably, as you said, involves regulatory action, is useful in terms of its explanation of the theory behind cases like Pacific Rivers v. Thomas and that the line that it draws is whether the agency is continuing itself to take actions implementing the prior activity. Here, I don't think that the actions that the Corps is taking in operating these existing dams are fairly characterized as an ongoing implementation of Congress's decision to build them. I think that what the National Wildlife Federation case shows us in sort of splitting apart existence versus operation is that the fact that this dam exists, the fact that the Corps doesn't get to be the one to choose whether this dam is going to come down, that's Congress's determination. That means that the effects related to that dam are part of the baseline. And what we are concerned about when we're doing an ESA consultation under Section 7 is the agency's actual operation activities. But wouldn't building a second fish ladder or building a fish ladder on the other dam be part of the operation? If the Corps was proposing to do that, then yes, it would need to consult at that time. But frankly, as the Court has said, it's a do-no-harm provision. The fact that the Corps potentially could choose to do some other thing but hasn't done so yet doesn't mean that there's a duty to consult now. What you're saying is if they've consulted about their operation, if they're going to change the operation, they don't have to consult. That's correct. And I think that the practical issues that you got into, Judge Friedland, inform this in that if the existence of the dam is constantly carried over as being construed as itself an action, then, you know, at some point, we need to be able to leave the past in the past and focus on what the agency is actually doing in the present, and that's what the Corps did here. But if there are lots of options and there's discretion to undertake them, I'm having trouble understanding how the agency doesn't at least at some, every 10-year interval or something, need to consider whether something else should be happening, especially if the fish are going extinct in the meantime. Well, I'm sorry, were you going to continue? No, that's... Go ahead. Under Section 7, it simply doesn't need to. Section 7's focus is not on affirmative planning. It's on making sure that the particular actions the agency is taking are not harming. If it's operating this dam, the fish can't get past it, they're dying, and you have options for getting the fish past it that are within your discretion, why isn't that something the ESA requires you to consider? Well, I think we need to break down what it means to operate the dam. You know, most of these cases that come before this Court involving federal dams are very different dams that are established for power generation, flood control, where you have a federal agency making these operational decisions every day that directly impact fish and other species, like how much water is going through, what the flow rate's going to be. Here, we have these basically kind of inert blocks that have been put in the river to hold back an enormous quantity of sediment. So to say that the Corps is operating them, all the Corps is really doing is performing the mandatory safety inspections, taking care of the grounds, and we've acknowledged that the one thing that it does that does involve discretion and that, you know, does involve sort of an affirmative activity is its maintenance and its operation of the existing ladders at Degare Point. And again, that's what was consulted on here. But so the ladder was built at some point, right? It was, yes. Was it built by the Corps? So unfortunately, we're not really sure. We know that it happened sometime between 1910 and 1927 or 28. We don't have more information than that. We know that there was a flood and that they washed out, and then in 1938, the state of California built them back on. So on pages 8 to 10 of the reply brief, the opposing counsel lists lots of actions that they say the Corps has taken to modify fish ladders and fish counters and flashboards. The agency must have had discretion to do those things. Yes, so we don't dispute that the agency does have some discretion in the way it operates and maintains these dams. For example, the fish counter, the way that the flashboards are managed, the management of sediment and management of debris around the fish grates. Those are all things that are within the agency's discretion, and that's why it appropriately consulted with NIMS in this action about them. So the Section 7 analysis that's required for those activities is done. I would also... I'm sorry. Can I ask you this? Of course. Do you agree that the position of the service now is a change from what it was before? It is a change from 2012, yes. No question. Now, you also agree that when the service changes its position, it should give an explanation? Yes. Where is the explanation that the service gave, and why is it sufficient? So I would direct the Court to ER pages 56 to 60, which is from the 24 Biological Opinion, which recounts the history of the consultations here and in specific says what the 2012 Biological Opinion had and then the various objections that were raised. And then I would also point to ER page 79, which is where the 24 Biological Opinion says that the actions that are being considered here are different because the definition of the action that it has received from the Corps is different. So you're talking about ER 56 to 60 and ER 79? Yes. ER 56 to 60 just recounts the history. I don't see any explanation of any change in that. So it's simply recounting the history. There's not a moment after the history where the Corps then... explicitly says, and the fact that we had this 2012 Biological Opinion and that the Corps came forward and told us that what was in there was a problem is why we've changed it. That comes out in ER 79. You know, as the District Court said here, there is certainly more that NMFS could have said to be explicit about the fact that it was changing because it had received this clarification from the Corps about what the particular activities are. But I think that what's in there is sufficient to show that that's what was driving the change here. So would you object to us reversing and remanding for the District Court to require further explanation? I don't think it's necessary, Your Honour. I think that it can be... what the service was doing can be inferred from what's in there. I think, as was suggested before, if it went back, it would simply be an opportunity to make explicit what I think is plainly implied in the history. So one of your arguments about why the agency doesn't really have discretion to, like, build a new fish ladder or make some modification is that there are these limits on how much the agency can spend. But if a private party came to you and said, we want to pay for this, would you then have an obligation to consult about whether you should accept the donation? No. And the reason is, in the Section 7, in the Carrick Tribe case, it talks about the two components that are needed to have a Section 7 consultation, and one of them is discretion. And the presence of funding or authorization certainly goes to whether there's discretion. But the other piece, as we've been talking about, is that there has to be an action in the first place, and that action has to be affirmative. Well, the action would be saying, thanks anyway. You know, I think it would... If the agency... If it came up in some context where the agency was making something like, you know, a final decision that was itself judicially challengeable, maybe there's a question there. But if it's simply that there's an option out there that an agency could pursue, that's not enough to trigger Section 7. Otherwise, you know, it's always... You know, an agency could always be looking for other things that it could be doing to help listed species. The requirement is simply not that it be consulting all the time, every time that it is not pursuing those routes. Related to that, I would point out to the Court that, you know, what's going on in this case is minimal and relates to the specific activities that the Court is taking. But it doesn't mean that the Court is not actually pursuing larger-scale efforts and, you know, working to seek congressional authorization to do more for these species. The briefs at several points reference this ecosystem remediation study that's being done that the Court received authorization to pursue. It has completed that study. It has identified, you know, tens of millions of dollars worth, $97 million, I believe, worth of habitat restoration activities that could be undertaken if Congress so authorized for the benefit of these species. It's just that this particular case is only about these custodial activities that the Court is taking at these dams today. It's not... Well, that's your position about what the case is about, but it's not their position about what the case is about. Understood. We think that under the Section 7 case law, that's what this case is about. But we don't have... I guess I come back to my first question of what is the case that tells us that Section 7 defines inaction the way you are when it's the agency's action rather than a regulatory function? I think... And I would go back again to National Wildlife v. NIMPS. I think that's the best one because it does acknowledge that there's this difference between dams existing and dams operating. But it doesn't say what's in which category. I mean, it just says we have to look at both, and the second one has discretion, so I guess it doesn't tell us very much. I think that in terms of what... Because it wasn't applied. I mean, that difference wasn't... It's sort of dicta. I mean, it's not... That case didn't turn on that distinction at all, so we don't know how that distinction gets applied. I think that existence versus operation can be a tricky thing to parse out what goes in what category in some cases. I think here that it is rather simple in that we do have these dams where there are just not very many levers for the agency to be pulling on a day-to-day basis. The only thing that the agencies could potentially be doing that it's not doing are things that go far beyond the sort of affirmative activities that are the heartland of Section 7 and sort of goes more into this place of treating Section 7 as, you know, an opportunity for an agency to have to kind of do brainstorming on, well, what's everything that I could do to ameliorate the existence of these dams that already exist that the agency doesn't get to decide come down? How do you deal with the statute that says the agency can remove dams? So that language comes from... And let me pull it up because I just want to make sure that I get the number right because I know there's... I think it's in 2330A. Yes. So 2330A is one of the Corps' continuing authority statutes, and it's one that imposes a financial cap on what the agency can do. There's no possibility that it could remove these dams within the financial caps. I would also point out here that removal of the dam, in this instance, to speak kind of colloquially, right, these dams weren't put up on a lark. They are performing an important function. They're holding back millions of cubic yards of sediment, much of which is contaminated by mercury and cyanide and other things that are themselves dangerous to fish. So it's not as if we have a situation where, well, everyone agrees that the easy answer is just let's take these dams down. There are good reasons that Congress hasn't, you know, said that these particular dams should come down. They're doing important work, and I think there's an open question about whether it would even be best for the species in the long run to kind of let all of that sediment loose and figure out what's going to happen with all of that, even understanding that, of course, the dam's continued existence is blocking their migration and is posing difficulty for these species. So I see that I'm about to go into the time that the intervener would have. The only thing I would say further to the Court, unless there are other questions, is that this case is not a referendum on the dam's existence, which is a question for Congress, and I don't think it should be about the universe of all the things that the Corps could be doing or, in Frenz's view, should be doing. The question is about the affirmative actions the Corps is taking, and there's no dispute here that those particular activities don't jeopardize species. For that ground, we believe that the Court should affirm the District Court. Thank you. Good morning, Your Honors. Howard Wilkins, representing defendant-intervenor Yuba County Water Agency, and I'll refer to it in shorthand as YCWA. In my limited time here, I'm going to try and cover three topics, which I don't think I'll be able to do. First is that the record shows that NIMPS adequately explained why it changed its position between biological opinions. Two, that Section 7 doesn't require... Why don't you tell me where the adequate explanation exists? It's in the record, and I would point you to the cases in the Arizona cattle growers where you said... No, no, no. Okay, but I guess... The record. The record. And what I want to say is that the original biological opinions were drafted before the National Wildlife Federation case came out. And in that case, when we briefed this, and I was part of that briefing in the original proceeding, we argued that, in light of National Wildlife Federation, the effects from the existence of the dams were not part of the action but were part of the baseline. And the court rejected that. Judge Carlton rejected that on the basis that that's not what the biological opinion said. So, but when NIMPS went back and reconciled... Or the court went back and reconsulted with NIMPS, they put in their 2012 biological opinion that the existence of the dams were part of the baseline. And then we had a very compressed consultation why CWA was a part of that consultation. We only had one day to review that proposed biological opinion before it came out. And that's part of the record. It's in these proceedings. And we and the court complained that NIMPS had a number of legal errors in its conclusions regarding the course authorities relating to the interrelated facilities that they claimed were interdependent, like the diversions and the powerhouses. But that biological opinion came out the next day. And so we had a number of meetings. The record says this. We explained our reasons why that biological opinion wasn't legally valid. Ultimately, we filed a lawsuit. YCWA filed a lawsuit challenging that biological opinion on the basis that it was both legally and technically not compliant with the ESA or best available science. And as a result of consultation with the court, NIMPS agreed to... They reconsulted. And that's what the 2014 biological opinion was about, was the court said, look, we don't have the authority to do these things that you want us to do. And so the idea that... Our point is the entire record bears out why there was a change in policy here. And it wasn't... It just didn't happen overnight. We had lawsuits. We had a multitude of meetings between the court and NIMPS regarding what the authorities were and other problems with the 2012 biological opinion. So this... The biological opinion itself in 2014 was pretty short in how it explained it. But this court has said, look, you don't have to be an absolute... It doesn't have to be exactly clear. We function with less than ideal clarity. But what it has to do is there has to be a reasonable explanation. That is discernible easily from this record, is our point. So it sounds like you're saying you filed briefs that led to this action. So are those briefs in this record? I'm sorry? It sounds like you're saying you filed a lawsuit that led to this change. Do we have in our record here any evidence of what you argued in that lawsuit? I know that... I'm pretty sure that the briefs are there. What I would say is that the letters that we wrote that we commented on the prior biological opinion, those are definitely part of the... So where in the record can we find those and read them? I honestly... I do have a big box back there. I might be able to... It would take me a long time to try and find them. I apologize. You're asking us to rely on this thing you can't point us to to explain what's going on? What I will tell you is that our lawsuit is referenced in the record on page... I believe it... It talks about the meetings on ER 58 that were held and then it talks in the background section which you've been cited to, and 79... I'm looking for where our lawsuit is here. You have a note, Mr. Wilkins. They're passing you a note. Sorry. SER 248. And that's the CORE's letter too. So there is a lot in this record. And we do cite to this in our briefs. So relating to why this happened, it is clear from the record that we explained it in our brief in detail. So I would point you to that knowing that I only have one minute left. I do want to just distinguish your decision in Organized Village v. Cake where you said that you held the explanation... change in explanation was invalid because on precisely the same record they had disregarded technical information. That is just simply not the case here. The record here is very different. And so I think the case is distinguishable. We obviously have briefed the issue... Oh, it looks like I have a little more time. So I'd also like to cover briefly that Section 7 didn't require consultation relating to the powerhouses or the diversions here. And I would point to the case law that you've recognized, the Ninth Circuit has held, that there needs to be some type of affirmative action on part of the agency in granting a permit. There are no proposals by any of the permittees at issue here. And most importantly, as it relates to the... I see my time keeps going up. That's because you're over. Oh, I'm over? All right, what I would say is that we briefed the issue that FERC has exclusive authority as it relates to the powerhouses. And with that, I would just ask that you affirm your prior precedent here and find that only affirmative agency action that is discretionary requires consultation. Thank you. Yes, Your Honors, if I may, I would like to address the point about the National Marine Fisheries Service not giving adequate explanation for their change in position. And again, just emphasize that there's... there appears to be an error in fisheries service reasoning that they had to accept the Corps' definition of the extent of their discretion. And I would just point out that this Court, in Sierra Club v. Babbitt, again, one of the cases that the defendants rely on, that the Court expressly stated that they were deferring, that they were giving deference to the Fish and Wildlife Service's determination of the extent of the action agency's discretion in that case. So it's error. In this case, this Court has established precedent. It would be error for the fisheries service, in this case, to say, well, we have to accept what the Corps says. I don't think it's the fisheries service says we have to accept it, but they do accept it. They do accept the Corps of Engineers' explanation. But they... but the record... they haven't explained, and the record at least implies that the reason they accepted the Corps' explanation is they thought they had to, that they had no ability not to. And here's the piece that's missing, is they lack an express description of why their detailed analysis in the 2012 biological opinion that the Army Corps does have discretion over these dams, why that was wrong. And if they were remand... if there was a remand and they were required to give... if they were given the instructions that you can't simply accept the Corps of Engineers' word for this, you have to do your own analysis, like you did in the 2012 biop, as the Sierra Club v. Babbitt case indicates, that, yes, it's appropriate for us to look at what do the resource agencies, either fisheries service or fish and wildlife service, have to say about the extent of discretion, because it's critical to whether there's a consultation duty. And, as this Court has established, plainly, the fisheries service or fish and wildlife service has a legal duty to reinitiate consultation. They can only reinitiate consultation under Home Builders, Supreme Court precedent, if the action agency has discretionary authority. So in making that determination, they're implicitly finding that the agency has discretion and they can require consultation. I see that I'm out of time. Thank you very much. Thank you very much. All right. The case of Friends of the River v. National Maritime Fisheries Services is submitted for decision. And that ends our calendar today. We will be in recess until 9 o'clock tomorrow morning. Thank you very much.
judges: Wallace, Bea, Friedland